## ALFORD *v.* JOHNSON.

Opinion delivered April 15, 1912.

1. EVIDENCE—PRIVILEGED COMMUNICATION—STATEMENT TO CLERGY-MAN.—Under Kirby's Digest, section 3097, which provides that "no minister of the gospel or priest of any denomination shall be compelled to testify in relation to any confession made to him in his professional character in the course of discipline enjoined by the rules or practice of such denomination," *held* that, before statements or confessions made to a minister of the gospel or priest of any denomination can be held to be inadmissible, it must appear that they were made to such minister or priest in his professional capacity, and because enjoined by the rules of discipline or practice of such religious denomination. (Page 239.)

2. WILLS—FRAUD OR UNDUE INFLUENCE.—To establish a charge of fraud or undue influence in the execution of a will, it must be established (1) that deception was practiced or influence exercised; (2) that the fraud or influence was effectual in misleading or coercing the testator in the execution of the will. (Page 242.)

3. SAME—FRAUD OR UNDUE INFLUENCE.—The fraud or undue influence which is required to avoid a will must be directly connected with its execution, and must be, not the legitimate influence which springs from natural affection, but the malign influence which springs from fear, coercion or other cause that deprives the testator of freedom in the distribution of his property. (Page 242.)

4. SAME—UNDUE INFLUENCE—EVIDENCE.—Undue influence in the procurement of a will may be proved not only by direct and positive testimony but by facts and circumstances from which such undue influence may reasonably be inferred. (Page 242.)

5. SAME—UNDUE INFLUENCE—SCOPE OF INQUIRY.—In order to determine the capacity of the testator and his freedom of action, it is competent to inquire into all the facts and circumstances, whether before or after the time of the making of the will. (Page 243.)

6. SAME—UNDUE INFLUENCE—PRESUMPTION.—No presumption of undue influence arises from the mere fact that the beneficiary in a will holds unlawful sexual relations with the testator; but such fact is admissible in evidence, in connection with other testimony tending to prove undue influence. (Page 244.)

Appeal from Pike Circuit Court; *Jefferson T. Cowling,* Judge; affirmed.

*George A. McConnell,* for appellants.

1. It appears by the witness Warlick's testimony that he was a minister of the gospel, acting in that capacity in his visits to the testator, and instructing the testator in the rules and practices of the church, he being a penitent seeking instruction from the minister. The testator's statements to the minister were privileged communications, and the court erred in admitting them as testimony. Kirby's Dig., § 3097; art. 2, § 25, Const.; 95 S. W. 402; Wharton's Law of Evidence, § 597; 80 Ind. 203.

2. Notwithstanding his age and physical infirmities, the proof shows that the testator furnished from memory all the data from which the will was drafted, including the names of all his legal heirs, without prompting or assistance from any one. He unquestionably had the mental capacity to make the will. 95 Ark. 158; 87 Ark. 273.

3. The undue influence which avoids a will is not such as springs from natural affection or the ordinary affairs of life, but from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property. It must be specifically directed toward procuring a will in favor of the legatee and must be directly connected with the execution of the will and the procuring cause therefor.

"It consists virtually in substituting the will of the person exercising it for that of the testator."

Measured by these tests, there is no such undue influence shown in this case as would avoid the will. 87 Ark. 148; 49 Ark. 367. The fact that the ability to exert undue influence existed is not sufficient to avoid a will, even though the distribution was uuequal. 75 Ill. 260. It must not only be shown to have existed, but also proved affirmatively that it was exercised. *Id.*; 19 Ark. 533, 551; 49 Ark. 371; 28 Minn. 9, 11; 195 Pa. St. 282; 22 N. J. L. 117, 141; 48 N. J. Eq. 566; 95 Cal. 33; 45 N. J. Eq. 726.

*Callaway & Huie* and *Sain & Sain,* for appellees.

1. The testimony of the witness Warlick was competent and properly admitted. The statute as well as general authority

restricts the application of the privileged communication to a minister of the gospel to such confessions as are made "in the course of discipline enjoined by the rules of practice of the denomination." Kirby's Dig., § 3097; 95 S. W. (Mo.) 402; Wharton's Law of Evidence, § 597. See also Greenleaf on Evidence, (16 ed.), § 247; 99 Mo. 160, 17 Am. St. Rep. 552, 561.

2. The evidence fully sustains the verdict. On the question of undue influence, see 114 Mo. 35, and cases cited. Schouler on Wills, § 242.

FRAUENTHAL, J. This is an appeal from a judgment declaring invalid the alleged last will and testament of one W. S. Stroope. The contestants are the heirs at law of the testator; and the proponent of the will and chief beneficiary therein is Lorinda Alford, who claims to have been his house-keeper, but who, the contestants claim, was his mistress. The contestants sought to invalidate the will upon the grounds (1) that the testator did not possess sufficient mental capacity at the time of its execution, and (2) because it was obtained by the fraud and undue influence of said Lorinda Alford. The trial resulted in a verdict against the will. The proponent now seeks a reversal of the judgment upon the ground that the court erred in admitting certain testimony, and because the evidence adduced upon the trial of the case is insufficient to warrant the verdict which was returned.

During the progress of the trial, the contestants introduced as a witness one D. D. Warlick, who is a minister of the gospel of the Methodist Church. This witness testified that during 1907 he had conversations with the testator in which he spoke of his past life and of his adulterous relations with said Lorinda Alford, and of her great influence over him. He also testified that Stroope was not a member of his church or of any church; that on one of these occasions he spoke penitently of his conduct and of a desire to join his church. The witness told him, however, that he could not do this as long as he lived in these wrongful relations with a woman not his wife. He testified to other statements made by Stroope to him of his relations with and the influence exercised by Lorinda Alford over him. The appellant objected to the introduction of this testimony, upon the ground that these

communications were privileged. Her objection was over-ruled, and exception was properly saved to the ruling of the court.

It is contended that this testimony was inadmissible by reason of section 3097 of Kirby's Digest, which provides: "No minister of the gospel or priest of any denomination shall be compelled to testify in relation to any confession made to him in his professional character in the course of discipline enjoined by the rules or practice of such denomination." The communications that are made privileged by this statute are those which are made in the course of discipline by reason of the rules of the religious denomination. If the communications are made to one who happens to be a clergyman, but who does not sustain to the communicant that professional character or relation, then they are not privileged. Before the statements or confessions made to a minister of the gospel or priest of any denomination can be held to be inadmissible, it must appear from the evidence that they were made to such minister or priest in his professional character, and because enjoined by the rules or discipline or practice of such religious denomination. As is said in Wharton on the Law of Evidence, § 597: "Under these statutes, however, a communication to be privileged must be made by a penitent as an enjoined religious discipline, to a priest, and does not cover a confession made to a clergyman not in the course of such discipline." See also Wigmore on Evidence, § 2693; *Knight* v. *Lee*, 80 Ind. 201; *State* v. *Morgan*, (Mo.) 95 S. W. 402.

It does not appear from the testimony adduced in this case that the statements made by Stroope to Warlick were made to him in any professional relation to Stroope as a clergyman, nor was there any testimony that such statements were made in the course of discipline enjoined by any rules or practice of the religious denomination of which Warlick was a member. These communications were made to Warlick in like manner as to any individual; and while it is true that Stroope also spoke to him relative to his desire to become a member of his church, the communications were not made to Warlick in his professional character or by reason of any rule or practice of that church. It follows that the testimony given by this witness was not inadmissible by reason of the above statute;

and appellant did not object to the admissibility of this testimony upon any other ground.

Counsel for appellant does not urge upon this appeal that the court committed any error in any ruling which it made upon the instructions which were given and refused by it. We have examined all of these instructions, and we find that those which were given fully and fairly presented every issue involved in the case. The sole question, therefore, which is presented for our determination is whether or not the evidence which was adduced upon the trial of this case was sufficient to sustain the verdict which was returned.

The will was executed by W. S. Stroope on February 26, 1908. At that time the testator was eighty-eight years old; and he died on July 8, 1909. By its terms he bequeathed and devised unto the said Lorinda Alford all his real and personal property for her use and benefit during her life. After her death, he directed that all his property which was not consumed by her during her life should go to his daughter and grandchildren, who were then his only heirs. W. S. Stroope was a married man, and in 1880 was living with his wife and five children in Clark County. At that time he seemed to be living happily with his wife who, according to the testimony, made him a dutiful spouse, and gave him no cause to abandon her, as he subsequently did. About that time he became acquainted with Lorinda Alford, who was a young widow twenty-four years old. Soon thereafter he left his family and his home and went with this woman to Pike County, where they lived together from that time until his death. During all these years he never returned to his home except possibly upon one occasion, and never saw his wife at all, and only saw some of his children and grandchildren a very few times. He lived principally during that time in the town of Murfreesboro. The proponent of the will testified that she was employed during all these years as his housekeeper, and had no illicit relations with him. She, however, admitted, and the uncontroverted evidence shows, that for almost thirty years she lived alone in the same house with him; that, being enamoured of her, he left his wife, who had been dutiful to him, and his children, for whom he seemed to have some affection, and that she was well acquainted with all of them and the cause and

circumstances of his abandonment of his family. But during all those years he and she were strangers to his family. The knowledge that he had left his wife and children, the great estrangement that was caused by his living with her, and the fact that they lived together during those long years in the same house, alone, was amply sufficient to justify the jury in finding that their relations were meretricious and adulterous. There was testimony tending to prove that some years before his death the testator visited one of his sons, who was then living, and stayed at his house only a few moments. When asked why he did not take a chair and sit down, he said: "Rinda (meaning the appellant) is watching me now." On another occasion, when he went to see this son, who lived in the same town, he said that appellant objected to his going, and that she said that she wished his son "would take a stick and break his head" because he went.

The witness Warlick testified that Stroope told him that the woman had such a great influence over him that he could not break with her or leave her, and that she seemed "to charm him like a cat." And, when the witness told him that he could not join his church as long as he lived in his adulterous relations with the woman, Stroope told him that, on account of her great influence over him, he was unable to leave her.

It appears that in 1907 they had some misunderstanding, and that they agreed to separate. A written contract was then drafted and executed by them, in which a division of the property possessed by him was made; and under the terms thereof, amongst other things, he gave her $2,500. In the written agreement it was also provided that they were to thereafter live separate and apart. The appellant testified that when she prepared then to leave him he begged her so hard not to leave him, but to remain, that she did so.

In 1909 it appears that he conveyed to her a piece of real estate for an alleged consideration of $750; that shortly before his death he disposed of another piece of property for $1,200 which the jury were warranted in finding he and appellant had at the time of his death.

At the time of the execution of the will, the testator was feeble in body and not strong in mind. The testimony, however, does not show that his mind was so impaired that he did

not have sufficient mental capacity to make a will; and we do not think there was sufficient testimony introduced on the trial of this case to invalidate the will on account of the lack of testamentary capacity. But the testimony does show that he was very old, feeble both in body and mind, and for that reason easily subject to influence. The question then recurs: Was there sufficient evidence to sustain a finding that the will was obtained by fraud or undue influence?

To establish a charge of fraud or undue influence, two points must be sustained: First, it must be established by evidence that deception was practiced or influence exercised; and, second, that the fraud or influence was effectual in producing the alleged result of misleading or coercing the testator in the execution of the will. Before a will can be invalidated upon the ground of undue influence, there must be testimony proving or tending to prove that the influence was of such a character as to destroy the testator's free agency, in effect substituting another's will in the place of his own.

In the case of *McCulloch* v. *Campbell*, 49 Ark. 367, the rule relative to the degree of fraud or undue influence necessary to invalidate a will is thus stated: "As we understand the rule, the fraud or undue influence which is required to avoid a will must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which springs from fear, coercion or any other cause that deprives the testator in the free agency of the distribution of his property, and the influence must be directed toward the object of procuring a will in favor of parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution."

But the proof of such undue influence may be made, not only by direct and positive testimony, but by facts and circumstances from which such undue influences may be reasonably inferred. And this proof is permitted to take a very wide range. There must be free agency on the part of the testator, but in order that there may be such free agency there must be a state of mind on his part free to act; and if, therefore, he is restrained or coerced unduly by the relation he bears to, or the influence

exercised by, one over him in the execution of the will, his free agency is to that extent destroyed. For this reason, it is competent, in order to determine the capacity of the testator and his free action at the time the will is made, to inquire into all the facts and circumstances, before, at, or after the time of the making of the will, in order to enable the jury to determine the probable state of his mind, and the extent and effect of the alleged influence at the time the will is executed.

As is said in the case of *Tobin* v. *Jenkins*, 29 Ark. 151: "As regards undue restraint, it may be proper to remark that it is not necessary that the mind shall act under influences at the time brought to bear or then employed, but they may be such as have at a previous time been so fixed and impressed as to retain their controlling influence at the time the act is done."

It has been held in some cases that the mere fact that the testator made the will in favor of a woman living with him as his mistress raised a presumption of undue influence, and that such a state of facts was sufficient as a matter of law to justify a finding that such person exercised such an ascendency over the testator as to destroy his free agency. But, according to the weight of authority, a presumption of undue influence does not arise as a matter of law from the mere fact that the beneficiary in a will holds unlawful sexual relations with the testator, and proof of such relations is not in itself sufficient to sustain a finding of undue influence. As long as the absolute power of testamentary disposition is conceded, a testator has the right to make a disposition of his property by will to one with whom his relations have been meretricious if it is a free and voluntary act, and of one having proper mental capacity. In order for a will to be valid, it is not necessary that the motive which led to its execution should be virtuous, or that the object of the testator's bounty should be meritorious; it is only essential that the will should be the free and voluntary act of a mind having proper testamentary capacity. With the morals or justice of the provisions of such will, the courts can not deal. If it is in conformity with the wishes of the testator, it is his will, and not that of another; and it then becomes the duty of the court to give it effect, without reference to the motives of the testator or the unjustness of its provisions.

But, from the very nature of the case, evidence of undue influence, like that of fraud, must necessarily be mainly circumstantial. Undue influence is not exercised, ordinarily, openly in the presence of others, so that it can be proved by direct testimony. In the very nature of things, influence springs from relations; and undue influence may be inferred as a matter of fact from the character of those relations. There can be no doubt that a long continued relation of adulterous intercourse is a source of great mutual influence of each of the parties over the mind and person of the other. As is said in the case of *Smith* v. *Henline*, 174 Ill. 184: "The existence of an illicit relationship between a deceased testator and his mistress will not give rise to a presumption of undue influence as a matter of law. But undue influence is more readily inferred in the case of a will made in favor of a mistress than in the case of a will made in favor of a wife. The existence of the relation is a strong circumstance to be considered by the jury along with other facts in the case."

When, therefore, undue influence is charged, the fact that the person accused of exercising it lived in illicit relations with the testator is properly admitted in evidence, to be considered by the jury, and from such testimony the jury may draw an inference of fact of such undue influence. And when, in addition to this, there is any direct testimony adduced in evidence showing that such influence has been actually exercised, then it will be sufficient to justify the finding that the execution of the will was not a free and unrestrained act of the testator, and therefore that it was executed through undue influence sufficient to invalidate it. While it is true that a presumption of undue influence will not arise as a matter of law from the mere fact that the will is favorable to one occupying illegal relations to the testator, yet it is an important fact to go to the jury as a circumstance to be considered by them along with other testimony in the case tending to prove the exercise of undue influence. There is a distinction between influence exerted through a lawful relation and that exercised by one occupying an unlawful and adulterous relation. Much less evidence will be required to establish undue influence on the part of one holding wrongful and meretricious relations with the testator. Page on Wills. § 411; *McClure* v. *McClure*,

86 Tenn. 173; note to case of *Saxton* v. *Krumm*, 17 L. R. A. (N. S.) 477; In re *Storer's Will*, 28 Minn. 11.   See also note to In re *Hess' Will*, 31 Am. St. Rep. 665.

The testimony adduced in this case was not only sufficient to warrant a finding that there existed wrongful sexual relations between the testator and the proponent of this will, but it was sufficient also to prove a course of adulterous conduct between them that continued for years.   From the testimony, the jury were warranted in finding that the testator was influenced during the entire latter portion of his life by the appellant, who obtained an ascendency over him that dominated him.

The witness Warlick testified that Stroope told him on several different occasions during the summer of 1907 that he had been living happily with his wife and family until the appellant "got her hand on him and wrecked his family." And when he advised Stroope to leave her he said that she exercised such an influence over him that he could not throw it off, and that he was subject to her will.   He also testified that Stroope told him that she had managed to get the greater part of his property from him.   According to the testimony of the appellant herself, the testator shortly before making this will entered into a written contract with her by which they agreed to separate; but when she prepared to leave him he could not bear her absence, and pleaded with her to remain with him.   Her own testimony shows the overpowering influence which she exerted over him.   The testimony further shows that he feared to visit his children or grandchildren, because he thought that she was watching him, and he knew that she was unwilling for him to make such visits.   Shortly after making the will, he conveyed certain property to her, and the jury were warranted in finding that the conveyance was made without valuable consideration.   At the time of the execution of the will he was eighty-eight years old, decrepit in body and, if not incapacitated mentally to such an extent as to invalidate the will, yet weak in mind and easily subject to influence.

Under these facts and circumstances, we are of opinion that the jury were warranted in finding that the proponent of the will, who had lived with the testator in adultery for all these long years, exercised over him an influence that destroyed his free agency and caused him to forget the relation and deserts.

of his own flesh and blood, and to make her in effect the sole beneficiary of his bounty. We can not say therefore that the evidence is not sufficient to sustain the verdict which the jury returned.

Finding no prejudicial error committed in the trial of this case, the judgment is accordingly affirmed.

KIRBY, J., dissents.